UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

JANE DOE 1 and
JANE DOE 2

      Plaintiffs,

v.

CITY OF LAUDERHILL, a municipality;
THOMAS MERENDA, an individual; and
FRANKLIN HARTLEY, an individual.

      Defendants.

_____/

## ORIGINAL COMPLAINT

Plaintiffs, JANE DOE 1 and JANE DOE 2 sue the DEFENDANTS, jointly and severally, and allege as follows:

## JURISDICTION

1.     This is an action for damages arising out of one or more violations of State and Federal law as detailed below.

2.     This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the Fourth and Fourteenth Amendments to the United States Constitution and the tort law of the State of Florida.  Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. §1983 and the constitutional provisions mentioned above and the tort law of the State of Florida.

3.     The supplemental jurisdiction of this Court is invoked with respect to the Plaintiffs' claims under the laws of Florida pursuant to:

(a)     Title 28 U.S.C. § 1367(a), because the Florida claim is so related to the federal claims within the Court's original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution; and

(b)     Title 28 U.S.C. § 1343, because the claim arises out of the same operative facts as the federal claim, and is such that the parties would ordinarily expect to try them in one proceeding.

4.     Venue is proper for the United States District Court for the Southern District of Florida because pursuant to 28 U.S.C. § 1391(b) & (c), the acts and practices that give rise to Plaintiffs' claims occurred within the Southern District of Florida, and because the Defendants are subject to personal and/or official capacity jurisdiction there.

5.     In connection with the acts, practices and violations alleged below, the Defendants have each, either directly or indirectly, violated the constitutional rights of the Plaintiffs.

6.     All conditions precedent under Florida law for the filing of this lawsuit have been satisfied.

7.   The Plaintiffs seek an award of damages for permanent, physical, mental and emotional injuries, loss of enjoyment of life, punitive damages, court costs, and attorney fees.

## PARTIES

8.     Plaintiff JANE DOE 1, at all times material hereto, has been a resident of Broward County, Florida.

9.     Plaintiff JANE DOE 2, at all times material hereto, has been a resident of Palm Beach County, Florida.

10.     Defendant CITY OF LAUDERHILL is a municipality located in Broward County, Florida and is responsible, through its officers, employees, servants, and agents, for enforcing the regulations of the Defendant CITY OF LAUDERHILL and for ensuring that its officers, employees, servants, and agents obey the laws of the State of Florida and the United States.

11.     Defendants FRANKLIN HARTLEY and THOMAS MERENDA, at all times material herein, were duly appointed police officers with the CITY OF LAUDERHILL Police Department, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Florida and/or Broward County and/or the CITY OF LAUDERHILL.  Defendants HARTLEY and MERENDA are being sued in their individual capacities.

12.     At all times material hereto, and in all of their acts described herein, Defendants were acting under the color of State law and color of their authority as public officials and public employees of the State of Florida.

13.     The wrongful actions of the Defendants constitute assault and battery, sexual battery, false imprisonment, intentional infliction of emotional distress, and negligence under the laws of the State of Florida.

**ALLEGATIONS OF FACT**

14.     Defendant, CITY OF LAUDERHILL, has created a police department where officers consistently violate the constitutional rights of the people of Lauderhill by establishing the following policies, customs and procedures that will be explained in full detail and with specific examples in this Complaint.  The policies, customs and procedures are:

      a.     The CITY OF LAUDERHILL hires violent and dangerous individuals as police officers.

3

      b.      The CITY OF LAUDERHILL fails to discipline its officers when they commit crimes, violate the rights of individuals, lie and violate departmental policies.

      c.      The CITY OF LAUDERHILL consistently fails to discipline its' officers because the cost of disciplining and firing an officer can be substantial where an officer contests the discipline or termination.  The CITY OF LAUDERHILL consistently and for years has decided to not discipline or fire an officer as a way to save money.

      d.      The CITY OF LAUDERHILL has consistently and for years lied to the Florida Department of Law Enforcement (FDLE) regarding the findings of internal affairs reports and the reason that officers have left the department.  The reason the CITY OF LAUDERHILL engages in this practice of fraud regarding its reports to FDLE is two-fold:  First, FDLE is the agency that can revoke the authority of a person to be a police officer and therefore if FDLE is notified by the CITY OF LAUDERHILL that a police officer has engaged in misconduct or criminal activities FDLE may revoke the officers law enforcement certification.  The CITY OF LAUDERHILL knows that any action taken by FDLE against one of its' officers certifications will cause the affected officer, through his or her police union funded attorney(s), to contest the validity of the information sent from the CITY OF LAUDERHILL to FDLE and the litigation that will stem from the union action will cost the CITY OF LAUDERHILL money.  The examples that are contained within this complaint will show that the CITY has a pattern and custom of agreeing to knowingly report false information to FDLE as a part of settlement negotiations with officers who are facing discipline and/or termination as a method to save the CITY money when dealing with such officers and their union funded attorneys. The result is that the CITY saves money on legal costs and known dangerous officers are

4

put back to work as a police officer.  The second reason the CITY OF LAUDERHILL intentionally submits false information to FDLE is that the CITY knows that the database kept by FDLE is a compilation of the data supplied to FDLE by the CITY and is easily searchable and constantly used by the news media and civil rights attorneys to expose problems within police departments.   Therefore by supplying FDLE with false information regarding its officers the CITY can give the appearance that the police department has fewer problems than it does.

      e.      The CITY has intentionally created an internal affairs division that is totally ineffective at redressing the grievances of the people of Lauderhill and as such it is unable to deter police officers who are predisposed to commit crimes when in uniform.  It is common knowledge among the CITY'S officers that they can act with impunity because the investigatory arm of the police department for Defendant CITY is nothing more than a window dressing to give the appearance that the CITY will safeguard the rights of the people of Lauderhill.  Again, the CITY is well aware that if it actually investigated officer misconduct the costs would be substantial because the CITY would then have to pay legal costs when it disciplined/terminated the officer and the CITY would also be forced to pay the citizens who were victimized because they would be more likely sue if the investigation showed that an officer had violated their rights.

      f.      The CITY has consistently and over many years sanctioned a "code of silence" by and among its officers which has created an environment where officers state that they "ride or die" with their fellow officers and will never believe a civilian over an officer regarding issues of officer misconduct and crimes.

g.     The CITY through a consistent pattern of conduct spanning more than a decade has made it clear to its officers that they will not be punished for victimizing the people of Lauderhill.

h.     The above polices were the moving force behind the injuries suffered by the Plaintiffs.

**A.   <u>THE ARMED RAPE AND OTHER CIVIL RIGHTS VIOLATIONS COMMITTED BY DEFENDANTS FRANKLIN HARTLEY AND THOMAS MERENDA ON MAY 24, 2012 AGAINST THE PLAINTIFFS.</u>**

15.     The evidence showing that DEFENDANTS HARTLEY and MERENDA committed an armed sexual battery, kidnapping and a variety of other civil rights violations against the Plaintiffs is overwhelming and terrifying.  Based on GPS data from DEFENDANT HARTLEY and MERENDA's police cars, the sworn statements' of victims and several other corroborating witnesses, DEFENDANT HARTLEY and MERENDA's cell phone records and radio communication recordings as well as physical evidence found on the scene a clear picture of their crimes emerge.  (Ex. A. – 19 page case summary from Lieutenant Michael Lacey)

16.     The morning HARTLEY and MERENDA attacked the Plaintiffs the Lauderhill Police Department had only ten (10) officers on duty, including the defendants. HARTLEY and MERENDA were the only two officers assigned to the entire Northwest district of Lauderhill and together comprised 20% of the Lauderhill Police officers on the streets.  (Ex. B. – Lauderhill Police Dept Daily Line-up for 5/24/12)

17.     At about 4:00 A.M. on May 24, 2012, DEFENDANT HARTLEY, decided to use his position as a police officer for the CITY OF LAUDERHILL to victimize women.

18.     DEFENDANT HARTLEY, knowing that Vegas Cabaret closes at 4:00 A.M., parked his police car across the street from the bar so he could watch the women leaving and select the victim(s) he wanted.

19.     Based on the GPS in DEFENDANT HARTLEY's marked police car he watched JANE DOE 1 and JANE DOE 2, who were patrons of the establishment and not employees, as they walked out of the bar, got into a car together and drove away.  Defendant HARTLEY followed the women for several blocks, out of his jurisdiction and into the city Tamarac, until the women pulled into a Taco Bell drive-through and stopped.  JANE DOE 2 was in the driver's seat of the car when DEFENDANT HARTLEY activated his blue police lights and approached the driver's side window.  DEFENDANT HARTLEY then took JANE DOE 2's vehicle registration, insurance documentation and identification and ordered her to drive behind him to another location.

20.     The GPS in DEFENDANT HARTLEY's police car along with video surveillance recovered from stores along the route show DEFENDANT HARTLEY driving from the Taco Bell to a to a secluded location with the Plaintiffs following.  According to GPS in DEFENDANT HARTLEY's police car he left the Taco Bell at 4:06 A.M. and stopped on N.W. 57th street from 4:08 A.M. to 4:16 A.M.  DEFENDANT HARTLEY then drove to the back of a closed tire shop at 7300 West Commercial Boulevard.  DEFENDANT HARTLEY arrived at this unlit and isolated location at 4:19 A.M., got out of his car and told JANE DOE 2 to turn off her headlights and take the keys out of the ignition.  During this drive to the predetermined rape location DEFENDANT HARTLEY uses both the police radio and his personal cell phone to contact his co-defendant, DEFENDANT MERENDA, to plan the sexual assault as follows:

7

a)  At 4:07 A.M. DEFENDANT HARTLEY texts DEFENDANT MERENDA, "10-11x2" and "where are you".

   1.  *The term "10-11" means dispatching too rapidly.*

b)  At 4:08 A.M. DEFENDANT MERENDA responds and sends a text message back to DEFENDANT HARTLEY saying, "*D and d.  U got 10-12s?*"

   2.  *The term **<u>"10-12" means a visitor or ride-along is present but is used by officers to refer to when an officer's spouse or intimate partner is present.</u>***

c)  At 4:10 A.M. DEFENDANT HARTLEY is recorded over the main police radio channel "A" urgently telling DEFENDANT MERENDA to switch to radio channel "B" (the talk channel) and then DEFENDANT HARTLEY is recorded on channel "B" telling DEFENDANT MERENDA to answer his personal, yet city funded, cell phone.

d)  At 4:16 A.M. DEFENDANT HARTLEY called DEFENDANT MERENDA who did not answer but called him back immediately and the two men spoke for one minute and three seconds.

21.  According to the GPS in DEFENDANT MERENDA's marked police car he was located at Dunkin' Donuts when at 4:08 A.M. he sent the text to DEFENDANT HARTLEY that he was located at "D and d".  The Dunkin' Donuts is located on Oakland Park Boulevard and according to GPS DEFENDANT MERENDA was there from 3:45 A.M. to 4:18 A.M.  Then at 4:19 A.M., after the text messages, radio calls and phone conversation with DEFENDANT HARTLEY, DEFENDANT MERENDA's car is seen traveling to the rape location and rendezvous with DEFENDANT HARTLEY behind the tire shop on 7300 West Commercial

8

Boulevard.  DEFENDANT MERENDA gets to the pitch black and deserted area behind the tire shop at 4:24 A.M. and pulls his police car behind the Plaintiff's blocking them in.

22.    Based on the GPS from DEFENDANT HARTLEY and DEFENDANT MERENDA police cars both Defendants stay at the location they had selected to commit the sexual assault from the time they arrived – 4:19 A.M. for DEFENDANT HARTLEY and 4:24 A.M for DEFENDANT MERENDA – until 6:00 A.M.

23.    Once DEFENDANT MERENDA arrived behind the tire shop he turned off his lights and DEFENDANT HARTLEY then went to the passenger side door of the Plaintiff's car, grabs JANE DOE 1 by the arm and orders her to step out of the car.  DEFENDANT HARTLEY was in his uniform with his gun on his belt and at 6 feet two inches tall and weighting over 225 pounds he towered over JANE DOE 1.  DEFENDANT HARTLEY then escorts JANE DOE 1 away from the car she was riding in and away from JANE DOE 2 to an area of total darkness at the front of his police car.

24.    DEFENDANT MERENDA ordered JANE DOE 2 out of her car and escorted her to the rear of his police car and in the opposite direction of DEFENDANT HARTLEY and JANE DOE 1.  Once at the back of his car DEFENDANT MERENDA physically blocked JANE DOE 2 from viewing what was happening to her friend JANE DOE 1 and engaged her in bazaar conversations about his family, wife and marital problems.

25.    Over the course of the next hour and half JANE DOE 1 was forced to perform oral sex on the DEFENDANT HARTLEY and he then used his penis to penetrate JANE DOE 1 vaginally.  During the attack and in order to commit his crimes, DEFENDANT HARTLEY repeatedly threatened JANE DOE 1 with arrest and kept her within his grasp.  DEFENDANT HARTLEY did not wear a condom when he committed the sexual battery.

26.     After 90 minutes of forcibly holding JANE DOE 1 against her will DEFENDANT HARTLEY completed his sex crimes and walked JANE DOE 1 over to DEFENDANT MERENDA's patrol car.  JANE DOE 1 and JANE DOE 2 were then told to face DEFENDANT MERENDA's patrol car and DEFENDANT MERENDA and DEFENDANT HARTLEY swapped victims and preformed what can only loosely be described as a pat-down or search but was nothing more than a prolonged sexual fondling of JANE DOE 1's and JANE DOE 2's breasts and genitalia.

27.     DEFENDANT HARTLEY's and DEFENDANT MERENDA's shift ended at 6:30 A.M. so they released their victims at 6:00 A.M. and drove back to the City of Lauderhill Police station.

28.     Four days after the attack JANE DOE 2 reported the incident to a friend of hers, Lauderhill Police Department Sergeant Michael Santiago.  Being an honest and good cop Sergeant Santiago reported the crimes in writing to the Chief of the Lauderhill Police Department.  An investigation into the crimes of DEFENDANT HARTLEY and DEFENDANT MERENDA was initiated and based on the GPS in DEFENDANT HARTLEY's and DEFENDANT MERENDA's police car, the recorded radio transmissions cell phone calls and text messages, video recordings of the Officers' and Plaintiff's cars traveling to the crime scene, historical cell phone data showing the Plaintiff's phones located at the crime scene, JANE DOE 1's underwear found at the crime scene and corroborating sworn testimony from numerous witnesses regarding the incident DEFENDANT HARTLEY and DEFENDANT MERENDA were charged with various felonies and misdemeanors by the Broward State Attorney's Office.

29.     However, for JANE DOE 1 the story does not end on May 24, 2012, the night she was sexually assaulted by DEFENDANT HARTLEY because in late June of 2012 JANE DOE 1

10

found out that she was pregnant.  The gestational age of the fetus indicated a conception date of May 24, 2012.

30.     Feeling sure that it was DEFENDANT HARTLEY who impregnated her JANE DOE 1 elected to terminate the pregnancy.  On June 30, 2012 JANE DOE 1 underwent a procedure to terminate the pregnancy.

31.     However, just days after having the abortion JANE DOE 1began to feel ill and experience side affects her healthcare provider warned her about.  As instructed, JANE DOE 1 went to the emergency room.   In her emergency room visit, days after the June termination of her pregnancy, JANE DOE 1 discovered that the termination of pregnancy was not successful, she was still pregnant, and a second abortion would be required.

32.     On July 6, 2012 JANE DOE 1 underwent a second procedure to terminate the pregnancy.

33.     Upon execution of a search warrant the following items were inventoried from DEFENDANT HARTLEY's marked police unit #2073:  1 plastic baggie with approximately 6.1 grams of Marijuana, 2 pieces of notebook paper with names and telephone numbers, 1 palm print lifted from exterior surface of vehicle, and digital photos of the inside and outside of the vehicle. (Ex. C – Return & Inventory)

34.     Inside of DEFENDANT MERENDA'S marked police unit #2094 a search for investigatory purposes relating to the kidnapping, rape, and battery of Plaintiffs the following were found in the vehicle:  1 Blue Trojan Condom Box and 7 Condoms.  (Ex. D – Property Receipt)

35.     The Broward State Attorney's Office is currently prosecuting DEFENDANT HARTLEY and DEFENDANT MERENDA for several felonies and misdemeanors relating to

their attack on the Plaintiffs.  The undersigned attorneys have been able to obtain most of the prosecutions file using public records requests and the evidence we have obtained, although it is only a sample of DEFENDANT HARTLEY and DEFENDANT MERENDA'S daily activities as officers, clearly shows that DEFENDANT HARTLEY and DEFENDANT MERENDA got the message loud and clear that the CITY does not supervise its officers and if any of their misconduct is ever detected they will not be disciplined or terminated.

36.     For example on or around April 25 or 26, 2012 while in uniform and in marked police vehicles registered to the DEFENDANT CITY OF LAUDERHILL,  DEFENDANT HARTLEY along with DEFENDANT MERENDA spent 3-4 hours socializing, flirting, and having explicit sexual conversations with 3 off duty Broward Sheriff's Office dispatch employees first at Denny's and then Chick-Fil-A.  The three women were off duty and intoxicated.  (Ex. E – Coleman Statement p.2,3,5,8)

37.     During the 3-4 hour escapade DEFENDANTS HARTLEY and MERENDA, were both on duty, in full Lauderhill Police Uniform with guns and driving marked vehicles. The conversation between DEFENDANT HARTLEY, DEFENDANT MERENDA and the 3 women became so sexually explicit, detailing MERENDA'S affinity for being hit in the testicles, that one woman left the area because she felt uncomfortable.  (Ex. E. – Coleman Statement p.2-3,8;  Ex. F – Stephanie Ruebottom Statement, p. 2-3.)

38.     As the explicitness of the conversation escalated DEFENDANT HARTLEY grabbed the hand of B.S.O dispatcher Stephanie Oakley and made her punch DEFENDANT MERENDA in the testicles.  The DEFENDANTS and the remaining two women all laughed and joke immediately after.  (Ex. G – Stephanie Oakley Stmt. P. 2-4)

39.     Public records in the Broward State Attorney's criminal case against

DEFENDANTS HARTLEY and MERENDA also contained a record of cell phone text messages

from MERENDA'S phone from April 24, 2012 to June 8, 2012.

40.     Based on the six weeks of phone records it is obvious that DEFENDANT

MERENDA knows that he is not being supervised in any way by the CITY and he feels

comfortable committing crimes and acting out sexually when on duty.

41.     For example on May 21, 2012, only three days before DEFENDANT HARTLEY

and  DEFENDANT  MERENDA  attacked  the  Plaintiffs,  DEFENDANT  MERENDA  and

DEFENDANT HARTLEY engage in a text conversation via cell phone regarding a possible

opportunity for them to assault women while on duty if only they had been dispatched to a local

hotel  together.    The  text  messages  demonstrate  the  willingness  of  both  DEFENDANTS  to

conspire to commit crimes while on duty against women seeking aid of the police and their

ability to get away with it due to lack of supervision.   Fortunately for the women, HARTLEY

was dispatched to the scene with an Officer who was not willing to take advantage of women.

(Ex. H. – MERENDA Text Records pgs. 26-27)

> HARTLEY: "If you were my 94 on a call last night instead of gay hopper…(referring to
> Officer Hopper of Lauderhill Police Department)"
> MERENDA:  "Why what happened?"  "Hot Chick?"
> HARTLEY:   "2 hot blonde chicks slightly drunk inverrary hotel flirting with us and
> hopper was cock blocking bad"
> MERENDA:  "Oh my gosh!!! Are you serious.  What a faggot!!!  How long are they
> staying there?  We can do a follow up on Wed"
> HARTLEY: "I stood by while they packed up to leave"
> MERENDA: "Dammit!!! They got thrown out?"
> HARTLEY: "No, were pissed at hotel"

42.     According to BSO dispatcher Leah Coleman DEFENDANT MERENDA choose

to engage in his extramarital affair with her during work hours instead of after work because he

felt that there was less of chance that the CITY would notice what he was doing than his wife noticing.  (Ex. H. – Merenda Text Records; Ex. E. – Coleman p. 9-11)

43.     Based on the limited sample of text messages that are currently available via the public records requests completed, it is obvious that DEFENDANT MERENDA knows that he can get away with having sex during work with another man when he sets-up the sexual encounter using his CITY funded cell phone and consummates the act during work, using his marked police car.  (Ex. H. – Merenda Text Records p. 10 of 38 cell recs)

> Mr. Lewis: "Take quick break n ride by my house"
> MERENDA: "U live too far.  Arent u around southgate?"
> Mr. Lewis:  "McNabb n 81st, where u"
> MERENDA: "My jurisdiction ends at pine island and commercial" "You got me thinking dammit"  "That is so far for me to sneak away.  I could get in trouble."
> Mr. Lewis: "I wnt to give u some tho"  "Dnt want u to get in trouble, I wnt to taste u right now..while u nut on my chest"
> MERENDA:  "I want to see what its like to swallow your cum.  I wish you were closer to where I am"
> Mr. Lewis:  "I wnt u now" "My dick on hard" "How bout I meet u on pine island n commercial" "Coo,"
> MERENDA:   "When im done with this call"
> Mr. Lewis: "U coming to get it"

44.     The cell phone data also shows that prior to May 24, 2014 DEFENDANT HARTLEY and DEFENDANT MERENDA were familiar with the location where they choose to victimize the Plaintiffs.    On May 1, 2012, about three weeks before the women were attacked DEFENDANT MERENDA and DEFENDANT HARTLEY engaged in a text conversation via cell phone where they planned to meet at the location where the attack on the Plaintiffs occurred.  (Ex. H. – Merenda Text Records, pg. 12 of 38)

> HARTLEY:  "To"
> MERENDA:  "Yo"
> HARTLEY:"56"
> HARTLEY:  'Dunkin donuts on commercial.  Behind tire place"
> MERENDA:  "51"

14

45.     In addition to cell phone data, the State Attorney's office has provided the undersigned with a few weeks worth of GPS data from DEFENDANT HARTLEY and DEFENDANT MERENDA's police cars.  This data shows that prior to when they attacked Plaintiffs on May 24, 2012 DEFENDANT HARTLEY and DEFENDANT MERENDA were very comfortable spending long periods of time, while on duty, isolated behind the tire shop.  For example on May 14, 2012 DEFENDANT HARTLEY, in his marked police unit and during his shift from 11:13 pm to 11:38pm, was parked in the dark and unlit location behind the address of 7300 W. Commercial Blvd., Lauderhill, FL 33319 with the following corresponding GPS coordinates: 26.19319 – 80.24784.  This is the same location where the kidnapping, rape, and assault and battery of the PLAINTIFFS occurred.  (Ex. I – map & coordinates)

46.     On May 15, 2012 DEFENDANT HARTLEY, in his marked police unit and during his shift from 4:35am to 6:15am, was parked in the same dark and unlit location behind the address of 7300 W. Commercial Blvd., Lauderhill, FL 33319 with the following corresponding GPS coordinates: 26.19325 – 80.24781.  This is the same location where the kidnapping, rape, and assault and battery of the PLAINTIFFS occurred. (Ex. J – map & coordinates)

47.     DEFENDANT HARTLEY knew that his supervisors were not monitoring his conduct in any manner.  He knew that the Automatic Vehicle Location Device (GPS) was not being monitored.  He knew that he could engage in sexually explicit conversations with his colleagues and others, he could engage in various sex acts on duty, and he could commit crimes on duty without risk of discovery by his supervisor.  He knew he could keep marijuana and lists of names and numbers in his car without question or risk to facilitate his commission of crimes

15

on duty.  Furthermore, DEFENDANT HARTLEY knew that could commit crimes with other CITY police officers, like DEFENDANT MERENDA and that the "code of silence" would protect him and if he was somehow discovered the CITY would not discipline or fire him because when officers were caught in the past they were not disciplined.

48.     DEFENDANT HARTLEY felt safe to commit sexual crimes with other officers, like DEFENDANT MERENDA, because it was common knowledge that supervision was non-existent and even if someone complained the Officer would never be disciplined in any meaningful manner.

49.     DEFENDANT HARTLEY knew that other officers within the DEFENDANT CITY had gotten away with preying on members of the opposite sex in the community he served and he knew there was no meaningful discipline for it.

50.     The well known lack of supervision, discipline and training within the Police Department of CITY OF LAUDERHILL was moving force of DEFENDANTS conduct.

51.     DEFENDANT MERENDA, like DEFENDANT HARTLEY, knew that his supervisors were not monitoring his conduct in any manner.  He knew that the Automatic Vehicle Location Device (GPS) was not being monitored.  He knew that he could engage in sexually explicit conversations with his colleagues and others on CITY funded devices, he could engage in various sex acts on duty, and he could commit crimes on duty without risk of discovery by his supervisor.  He knew he could keep condoms in his car without question or risk to facilitate his committing of crimes on duty.  Furthermore, DEFENDANT MERENDA knew he could do whatever he wanted to on duty, including commit crimes with other law enforcement officers of DEFENDANT CITY.

52.      DEFENDANT MERENDA felt safe to commit sexual crimes with other officers, like DEFENDANT HARTLEY, and have sex on duty because it was common knowledge that supervision was non-existent and even if someone complained the Officer would never be disciplined in any meaningful manner.

53.      The lack of supervision, discipline and training within the Police Department of CITY OF LAUDERHILL was the moving force behind the conduct of DEFENDANTS HARTLEY and MERENDA.

B.   **THE UNCONSTITUTIONAL PRACTICES OF DEFENDANT CITY OF LAUDERHILL AS SHOWN THROUGH THEIR PATTERN OF CONDUCT**

**Darrell Walker  -- 1997 to 2012.**

54.      Darrell Walker is the poster child for everything that is wrong with the CITY of Lauderhill and its police department.  During the 15 years that Darrell Walker worked for the CITY as a police officer the CITY employed every one of its policies and customs listed in subsections a-g of paragraph 14 in this Complaint.  Defendant CITY kept Walker on the streets to torment the citizens of Lauderhill, at the same time sending a clear message to all other police officers employed by the CITY that: supervision and discipline are non-existent within the Lauderhill Police Department; that the internal affairs unit may appear to exist on paper but in reality is nothing more than smoke and mirrors to give the appearance that the CITY will redress the injuries of its citizens; and that the "Code of Silence" within the CITY and department will prevail and Lauderhill officers will be protected.

55.      DEFENDANT CITY hired Walker as a police officer in April of 1997 less than one year after he was fired from Hollywood Police Department for sexually harassing two female cadets.  (Ex. K. – Sun-Sentinel 03.30.2000 Article).

17

56.     After several public records requests by the undersigned attorneys The DEFENDANT CITY has been unable to produce Walker's application for employment with the CITY or any records relating to his hiring in 1997.

57.     Not only did DEFENDANT CITY hire Walker knowing that he was a sexual predator who was found to be unfit for duty by the Hollywood Police Department but they hired him knowing that on the day he was fired by the Hollywood Police Department he had attacked an elderly motorist while still in uniform.  The attack on the elderly man occurred on July 25, 1996 as Walker was driving home from the Hollywood police department after having just been fired for sexual misconduct.  According to police reports Walker, in a Hollywood Police Department uniform, was in an auto accident with a 79-year-old man.  After the accident Walker, "leapt out" of his car, "sprinted to the window" of the elderly man, "leaned into the window, pulled and shook the man."  During the entire interaction Walker was witnessed screaming, "Get out! Get out!  You old son of a b----, get out!"  The incident was witnessed by Walter LaGraves, who at the time was the chief investigator with the Broward State Attorney's Office.  LaGraves recalls intervening and telling Walker that he was going to file a complaint, to which LaGraves remembers Walker replying "Go ahead."  As LaGraves called the Hollywood Police Department the elderly man was rushed to the hospital.  Doctors pronounced him dead of a heart attack a few minutes later.  (Ex. L. – Herald 4.11.00 article)

58.     The CITY, knowing what type of man Walker was, hired him to be a Lauderhill police officer in April of 1997.  According to Former Lauderhill Police Chief Alberto Melis and Lucy Crockett, the Lauderhill Police Spokeswoman, the CITY was "aware of Walker's background", "concluded Walker was eligible for employment" and "deserved a second chance."

18

According to Lauderhill City Manager, Jim Pennington, he "can't judge an individual until a case goes to court." (Ex. K. – Sun-Sentinel 03.30.2000 Article).

59.     Walker's reign of terror began as soon as Defendant CITY hired him as a police officer and over the next 13 years seven (7) of Walker's victims came forward after they were sexually abused.  In every case the CITY believed Walker over the victims and time and time again Defendant CITY worked to keep Walker on the streets and to avoid paying the legal fees that would come if they either fired him or if internal affairs made a finding that he had committed any misconduct.

60.     The first woman to report Walker's sex crimes to the Defendant CITY and the Lauderhill PD was Brenda Strong.  Several officers with the Lauderhill Police Department, including Walker, entered Ms. Strong's home on December 27, 1999 at 5 a.m., looking for a man who was suspected of stealing a car.  One man who was staying in Strong's home was arrested for resisting an officer without violence and all the officers left.  Then at 6 a.m. Walker returned to Strong's home alone.  Ms. Strong answered the door wearing only a long t-shirt that she wears to bed and Walker told her that he was sent back to her house because one of the men arrested said Strong was hiding drugs.  An investigation later determined that no one sent Walker back to the house and there was no tip about drugs.  Walker denied ever returning.  Strong told detectives that Walker was there and demanded to search her.  Strong, 31 at the time, asked to change into something more appropriate first.  Walker told her no and threatened that Strong and her two daughters could be evicted and jailed if she did not cooperate.  Walker turned Strong around and stood behind her.  He ran his hands along her backside and breasts.  He asked if Strong's daughters – 11 and 13, also in nightgowns – might be hiding drugs.  One at a time, with their mother in another room, Walker "searched" the girls.  On his way back out the door, Walker

warned them not to tell the other officers he had come back.  Both girls told their mother that Walker squeezed their breasts and backsides.  (Ex. M. -- December 11, 2011 Herald-Tribune article "Accusers say he is a predator in uniform") & (Ex. N. – Composite of IA 99-015 regarding Ms. Strong; IA 00-002 regarding Farbman; IA 00-003 regarding Nassau and Probable Cause Affidavit for Walker's arrest)

61.     Strong reported the sexual assault to internal affairs shortly after the incident and internal affairs began an investigation.

62.     In March of 2000, about four months after Walker attacked Strong, he pulled over Nicole Farbman for driving drunk with her brights on.  Walker gave her a sobriety test, which she failed.  He ordered her to the back seat of his police car and, when she sat down,  he shined his flashlight down the front of her blouse.  He told her that he needed to search for drugs. Farbman balked, so Walker gave her a choice:  He could call a female officer to do the search, but that would mean Farbman would go to jail;  Or he could do it himself.  Walker rubbed his hand along her left thigh and up the side of her breast, over her clothing.  Walker told her to lift up her shirt and her bra.  She started to cry.  Farbman protested the strip search and Walker warned her that he could take her to jail.  Farbman reached into her blouse and pulled her bra out towards Walker, sobbing as he watched.  Walker told Farbman that it was her "lucky night" and let her drive off drunk and crying.  (Exhibit M -- Herald-Tribune article "predator in uniform")

63.     Farbman, who was 23 at the time, filed a complaint with Lauderhill internal affairs in April of 2000.  Internal affairs was already investigating the allegations made by Strong and her two daughters and realized the two stories were similar.  (Ex. N. – Composite of IA 99-015  regarding Ms. Strong; IA 00-002 regarding Farbman; IA 00-003 regarding Nassau and Probable Cause Affidavit for Walker's arrest)

64.     On March 29, 2000 Walker was arrested for 7 charges relating to his crimes against Strong and her daughters and Farbman.  Walker was suspended without pay.   (Exhibit O. – Letter written by Defendant CITY)

65.     When Walker's arrest aired on the evening news another victim came forward and reported to the Lauderhill Police Department that she had also been assaulted by Walker.  Her name is Norma Nassau and she was assaulted by Walker in December 1998 when he came to her home after she was beaten and robbed in Lauderhill by three men.  When Walker responded to Nassau's home she was laying on the couch with several neighbors and friends fretting over her injuries.  Walker said that he needed to speak with Nassau alone, in the den.  He sat down and asked her to show him where it hurt.  Her ribs were badly bruised, Nassau told him, and it was too painful to lift her shirt. Walker reached inside her blouse and pulled her breasts out of her brassiere.  One of Nassau's friends walked in and shocked by what she was seeing asked Walker what he was doing. Nassau's friends urged her to report Walker but Nassau felt that nobody would believe her.  (Exhibit M -- Herald-Tribune article:  "predator in uniform")

66.      In January of 2002 defendant CITY OF LAUDERHILL settled out civil cases with Walker's victims paying $171,000.00 to Strong and her daughters and $65,000.00 to Farbman who was represented by Bradford Cohen one of the attorneys in this case.    (Ex. P – January 2002 Sentinel article)

67.     In June of 2002, Assistant State Attorney (ASA) Dennis Siegel, took the case where Walker had assaulted Strong and her daughters to trial.  Unfortunately, the state failed to prove beyond and to the exclusion of all reasonable doubt that Walker had committed the crimes and Walker was acquitted.  A.S.A. Siegel said after the trial that the defense presented Walker as a saintly person and the jury was never told that he was fired from the Hollywood Police

department following two incidents of sexual harassment or that Walker had assaulted Nichole Farbman and Norma Nassau when in uniform as a Lauderhill police officer.  (Ex. M -- Herald-Tribune article "predator in uniform")

68.    After losing the Strong case the State decided not to prosecute Walker for the Farbman and Nassau attacks because like the Strong case they would not be allowed to present to the jury the full picture of what Walker really was by presenting all his other similar acts of sexual violence against women.

### The CITY'S Response to Walker's Arrest, Prosecution and Internal Affairs Investigations 99-015 Regarding Ms. Strong; 00-002 Regarding Ms. Farbman; and 00-003 Regarding Ms. Nassau.

69.    Once Walker's criminal cases were over the Police Department's internal affairs unit began working to finish the investigations into the claims against Walker made by Strong, Farbman and Nassau.  Nothing prevents the CITY'S Police Department's internal affairs unit from finding that Walker committed some type of violation relating to Strong, Farbman or Nassau and forwarding that finding to FDLE so that they may take action against his law enforcement certificate.  Likewise nothing prevented the CITY from terminating Walker's employment as a police officer.  At this point the CITY was aware that Walker had been fired by the Hollywood Police Department for sexual misconduct, attacked an elderly man the day Hollywood fired him and then committed three factually similar sexually violent offenses when working for the CITY.  The CITY was also aware that Lauderhill detectives who arrested Walker regarding the Strong and Farbman cases had probable cause to arrest Walker and that the Office of the State Attorney filed the charges against Walker because they felt that they had a reasonable likelihood of convicting Walker.

70.     What did stop the CITY from taking any action against Walker was money.  If the CITY disciplined Walker in any meaningful way or fired him they would have had to fight him and his attorney.  This legal battle would have cost the CITY a substantial amount of money in legal fees so the CITY made the deliberate choice not to discipline Walker at all.

71.     On May 15, 2003, City Manager for the DEFENDANT CITY, Charles Faranda, sent a letter to Walker's attorneys stating that the current suspension that Walker was serving will be changed from suspended without pay to suspended with pay and that Walker will be paid back wages retroactive to September 11, 2002.  This letter was sent knowing that Walker was still under investigation by internal affairs and, that if the outcome of the investigation was not rigged, Walker could be found to have violated countless departmental polices and fired.   But, internal affairs at the CITY is rigged, and the City Manager Charles Faranda knew it.  The letter regarding Walker was sent to the Assistant City Manager and the Chief of Police.  (Ex. Q --  May 15th 2003 letter)

72.     In October of 2003, Lauderhill's internal affairs detectives closed the cases against Walker regarding Strong, Farbman and Nassau finding the allegations to be unsustained. Lauderhill then sent these findings to the Criminal Justice Standard and Training Commission run by the Florida Department of Law Enforcement (FDLE), where state officials determine an appropriate punishment if any for officer misconduct. The CITY was well aware that if they sustained any findings against Walker FDLE may take action against Walker's law enforcement certificate and this would cause Walker to sue the CITY and cost the CITY money when they had to defend their actions.  Therefore, the CITY sent the unsustained finding to FDLE ensuring the Walker's certification was safe and they would not incur any legal fees. (Ex. M. -- Herald-Tribune:  "Predator in uniform") & (Ex. R. – Letter from FDLE)

**What is FDLE'S Criminal Justice Standards & Training Commission, an Officer's**

**Global Profile and Why Do They Both Matter to an Officer and the CITY?**

73.     The Florida Department of Law Enforcement's (FDLE) Criminal Justice
Professionalism Division provides staff support to the Criminal Justice Standards & Training
Commission.  The Criminal Justice Standards & Training Commission (CJSTC) established
under Florida Statute, Chapter 943, is an independent policy making body that ensures that
Florida's citizens are served by a qualified, well trained, competent, and ethical law enforcement
community. The 19 member Commission is comprised of criminal justice and community
leaders as set forth in Florida Statute. The CJSTC is responsible for creating entry-level curricula
and certification testing for criminal justice officers in Florida, establishing minimum standards
for employment and certification, **and revoking the certification** of officers who fail to
maintain        these        minimum        standards        of        conduct.
http://www.fdle.state.fl.us/Content/getdoc/91a75023-5a74-40ef-814d-8e7e5b622d4d/CJSTC-
Home-Page.aspx

74.     The Global Profile System is a public record maintained by FDLE which
provides a snapshot of a career of a law enforcement employee.  The Global Profile contains law
enforcement agency employees demographics, employment history which includes start and
separation dates with all affiliated agencies, the reason for separation (i.e. Terminated for
misconduct), qualifications, certifications, exams, training, and disciplinary case information.
The Global Profile is compiled using various types of data transmitted from an officers
employing agency.  The publicly accessible Global Profile System is regularly used by the media
and civil right attorneys to find problems within police departments and is also examined by

24

other law enforcement agencies if they are considering employing an officer who has previously worked as a police officer.

75.     Florida law enforcement agencies, like the Lauderhill Police Department, are responsible for providing FDLE with information regarding its officers using forms provided by CJSTC that are filled out, under oath, by designated persons within the agency.   For example, CJSTC form 61 should have been filled out when Walker was arrested on March 29, 2000 and the form should have reflected that under "7A" that Walker was suspended and the time of his suspension should have been listed on the form.  However, this is not what the CITY did.  The CITY sent FDLE a CJSTC form 61 stating that Walker's separation from the department was a result of his "Failure to meet mandatory Retraining Requirements."  The CITY lied to FDLE regarding the reason for  Walker's separation which was actually because he had been suspended after he was arrested and charged with felonies relating to sexual violence.  This intentionally false information is now reflected in Walker's Global Profile Sheet that reads as if his start date with Lauderhill was 8/27/1997 and his separation date was 7/1/2002 and his second start date (rehire date) was 11/21/2003.  (Ex. S. – CJSTC Form 61) & (Ex. T. -- Global Profile Sheet for Walker)

76.     The whole CITY and Police Department knew the information transmitted to FDLE was false.  In an October 15, 2003 email from the CITY'S attorney that was emailed to the Lauderhill Police Chief, Ken Pachnek, assistant city manager Desorae Giles and printed from the computer of the CITY'S human resources director Revlon Fennell-Johnson Walker's imminent rehire and payoff was discussed.  The email is directing the CITY and police department to calculate how much money they will need to pay Walker to avoid any litigation and directing them to calculate his "date of separation."  The bottom of the email contains a handwritten note

calculating Walker's "date of separation" as "3/29/00".  This date, 3/29/00, is the day the Walker was arrested by his own department for sexual assault and is the date that the CITY considers his separation date for purposes of paying Walker off.  However, when the information is transmitted to FDLE using the CJSTA 61 form the CITY lies and tells FDLE that Walker was separated for failing to meet retraining requirements.  (Ex. U. --  Email to CITY)

77.     On December 13, 2004 the CITY entered into a settlement agreement with Walker and paid him $75,000.00.  The agreement was ratified in Resolution number 04R-12-278 and approved by the whole city council for DEFENDANT CITY.   (Ex. V. – Resolution number 04R-12-278)

78.     This $75,000.00 was paid to Walker by the CITY in December of 2004 even though at the time they paid him he was under investigation for sexually assaulting another woman in a new and different case.

79.     In April of 2004 after a fight with her boyfriend, and 18-year-old pregnant woman called 911 for help.  Lauderhill officers responded to the scene and took her boyfriend to jail. After the other officers left, Walker came back.  Walker told the woman that he would check in on her once in a while to make sure that she was OK.  The next day, Walker stopped by her house when he was off-duty.  She invited him in.  They chatted for a bit, and then Walker asked her to turn around.  He said that wanted to admire her shape.  He made a lewd comment about her breasts.  He asked her to have sex with him.  Walker grabbed her breasts and rubbed them. The woman pulled away and Walker asked her if she was scared of him.  A neighbor knocked on the door and came inside.  Walker left.  Walker was at the woman's door the next morning at 8:30, this time in uniform.  The woman did not answer.  She also ignored his phone calls.  When the woman's boyfriend got out of jail, Walker pulled next to him in traffic and taunted the man.

26

On two more occasions, Walker confronted the boyfriend, once pointing his finger at the man's head and yelling: "I don't know why she is with your sorry ass." The woman told her boyfriend what had happened. She filed a complaint with the Lauderhill Police Department in May 2004. (Ex. M -- Herald-Tribune article: "Predator in uniform")

80.     When interviewed by internal affairs Walker denied touching the woman or asking for sex. He said that he was merely checking up on her. Five months later, internal affairs cleared Walker because there were no independent witnesses. The internal affairs report never mentions Walker's past or the striking similarity between all offenses that Walker commits. (Ex. M. -- Herald-Tribune article: "Predator in uniform").

81.     Post 2004 the CITY promoted Walker to Detective.

82.      In 2008 Walker requested that the CITY pay for him to take a course to become a Sex Crimes Investigator. Walker never got to take the course, but not because the CITY and the Police Department realized that it was not a good idea to have a sexual predator as a sex crimes detective, but because the course was full.

83.     At this point nobody was caught by surprise when another woman was sexually assaulted by Walker in February 2011.

84.      In February of 2011 a then 29-year old Diane Breedlove parked in a handicapped space at a Lauderhill fish market. While inside, a friend told her she was about to get a ticket. Breedlove rushed out and found a Lauderhill police cruiser blocking her car. Walker rolled down his window and beckoned the woman to come closer. Breedlove obeyed. He told her to lean into the window of his car. When Breedlove did, he complimented her on the tattoo on her breast. Breedlove snapped back and pulled her shirt close to her chest. Walker told her to come closer and he said he was going to give her a break. Breedlove leaned back into Walker's car

27

window.  He ran is finger across her chest. Then reached into her shirt under her bra and fondled her breasts.  Walker asked her if it felt good and told her breasts were beautiful.  Breedlove pulled away again, walked back to her car and got inside.  Her 9- and 10-year-old sons, who were waiting in the car, asked their mother why she was crying and she told them.   (Ex. M. -- Herald-Tribune "Predator in uniform" ) & (Ex. X. – Walker IA 11-01 Internal affairs summary regarding Breedlove)

85.    Breedlove filed a complaint which internal affairs "investigated".  Detectives interviewed Walker, who denied touching the woman or making any lewd comments.  Walker told the Detectives that Breedlove was "not attractive whatsoever."  The detectives interviewed Breedlove's two sons who stated that their mother leaned into the police car and when she returned to their car she was frightened and sobbing because of what Walker did to her.   Internal affairs detectives ruled the allegations against Walker "not sustained."  They cited the lack of independent witnesses to corroborate the woman's story.  This latest internal affairs investigation made no mention Walker's past conduct or that this latest attack dovetailed neatly with Walker's modus operandi.  Again FDLE was not notified so no action could be taken against Walker's law enforcement certificate.  (Ex. M. -- Herald-Tribune "predator in uniform")

86.    However, the CITY got sued by Breedlove and paid out another civil settlement for Walker in Broward Circuit Court case number CACE12020284.

87.    Then, finally on February 14 2012, Walker crossed the "thin blue line" and sexually harassed a co-worker, Detective Erika Williams.  But in this case the outcome was different because another Lauderhill Police officer, Detective Beans, witnessed the event.  Internal affairs investigation number IA 12-02 was initiated against Walker alleging sexual misconduct based on a claim that Walker looked at Detective Williams' nipple through her shirt

28

during lunch.  Two days later, on February 16, 2012, Walker was placed on administrative leave with pay over "nipple gate."   (Ex. Y. – Walker 12-02 Summary) & (Ex. Z. -- Memo from  Chief Smalling to Walker Dated 02.16.2012)

88.     Allegations and findings of IA 12-02 were closed by DEFENDANT CITY, through its officers and agents, on June 6, 2012 and **SUSTAINED** findings that Walker violated two departmental policies:  The first was a Code of Conduct violation relating to engaging in conduct that adversely affects the moral or efficiency of the department or may destroy public respect for the member and/or the department and/or destroy confidence in the operation of municipal police services.  The second sustained violation was for harassment in the work place. (Ex. AA. – Walker Sustained Violations)

89.     Sworn statements taken during the investigation of Walker in IA 12-02 show that the CITY'S past treatment of Walker and other officers has caused several dangerous world views to be held by Lauderhill Police officers.  For example, when Detective Anita Beans is questioned on May 31, 2012 regarding IA 12-02 she discusses the article "Predator in a uniform" that was published in December of 2011 featuring Walker and her knowledge that Walker was terminated due to sexual assaults and then rehired (lines 181-191).  Beans says, that you don't want to believe a sworn law enforcement officer would do those things (lines 191-194) and that after the article came out everyone read it and everyone was talking about it. (lines 482-484). But most troubling was Detective Beans' statement regarding the veracity of the complaints made against Walker by all the women he had victimized over the years when she stated, "typically you would take a sworn law enforcement officer's word over someone that lives in the inner city, you know that has no education and that's poor." (Lines 348-351).  Then Detective Beans goes on to recognize something that Lauderhill internal affairs and the CITY intentionally

avoided when she states that, "I guess from our [other CITY employees] perspective because <u>all the allegations are so very similar in nature</u> it's just, we don't want to believe it". (lines 351- 353) (Ex. BB. -- Sworn Statement of Det. Beans)

**THE CITY'S ACTIONS AFTER WALKER'S SECOND ROUND OF SEXUAL MISCONDUCT IN 2011 AND 2012**

90.     The CITY, consistent with its various customs relating to failing to discipline its' officers and covering up their misconduct, entered into a settlement agreement with Walker on August 29, 2012.  The CITY agreed to the following regarding Walker:

a.     The CITY agreed to purchase $78,729.36 of prior military service available to Walker to obtain 20.00 years of total service with the CITY in the CITY's Police Officers Retirement Plan so that Walker will be fully vested in the CITY's retirement plan and the CITY will pay him his retirement benefits every month for the rest of Walker's life.

b.     CITY agreed to complete the FDLE-CJSTC Form 78 (Internal Investigation Report) concerning IA 12-02, (the sustained findings cited above in paragraph 88) and indicate on line 10 that "The investigation was complete for policy violation of "Standard of Conduct and Prohibited Activity" was **UNFOUNDED.**   The completed Form 78 for this investigation will be retained at the agency level as part of IA 12-02.  By doing this the CITY ensures that FDLE will not take any action against Walker's certificate and he can get a job as a law enforcement officer with another agency.

c.     The Defendant CITY further agrees to report to FDLE on CJSTC Form 61, Affidavit of Separation, that Walker "Retired, Not Involving Misconduct."  FDLE CJSTC Form 61 is titled "Affidavit of Separation" this document is transmitted to FDLE anytime an officer is separated from an agency.  CJSTC Form 61 includes demographic information for the officer, agency contact, and very specific reasons for why the separation is occurring.  It is a

30

second degree misdemeanor for intentional false execution of this document.  CJSTC Form 61 is completed and transmitted by and agency representative to FDLE.  (Ex. CC – settlement agreement with its own exhibits A, B & C)

91.    The above agreement was signed by Charles Faranda, the City Manager.

92.    Exhibit "B" to said settlement agreement between Walker, CITY and the police union was drafted by City Manager Charles Faranda and states that he personally evaluated the findings from Internal Affairs Investigation 12-02 (IA 12-02) and has determined that each of the policy violations set forth in IA-12-02 are "Unfounded."

93.    According to the Lauderhill Police Department Policy and Procedures, Title: Professional Compliance Standards Unit and Complaints, §C Definitions, "sustained" is defined as "A completed investigation may be labeled sustained if:  1) the facts support the allegations as true, and/or;  2) the findings indicate that the employee committed one or more of the alleged acts and/or;  3) the findings indicate that the employee committed a violation other than the original allegation(s)."  (Ex. DD at pg. 2).

94.    According to the Lauderhill Police Department Policy and Procedures, Title: Professional Compliance Standards Unit and Complaints, §C Definitions, "unfounded" is defined as follows:  "A completed investigation may be labeled unfounded when the complainant admits to making a false allegation and the facts of the investigation support this; the accused employee was not involved in the incident; or there is no basis in the fact that the incident occurred.  An investigation may also be labeled unfounded if, after investigation, the allegation is demonstrably false or there is no credible evidence to support it."  (Ex. EE. at pg. 2-3).

95.    According to Florida Department of Law Enforcement "unfounded indicates the allegations are false or not supported by the facts."  This definition is found on page two of the

31

CJSTC Form 78 at number 11 describing what the "Agency Disposition" means.  (Ex. FF. – CJSTC Form 78 at pg. 2)

96.     The CITY, pursuant to the Walker settlement agreement, agreed to commit fraud by sending FDLE the CJSTC forms 78 and 61 that did not accurately reflect Walker's reason for separation or the true findings of IA 12-02.  The reason the fraud was an important barging chip for Walker and the CITY is because without the sustained internal affairs findings FDLE cannot take any action against Walker as a certified law enforcement officer and the fraud keeps Walker's Global Profile Sheet unblemished.  His separation from the Department is recorded on his Global Profile Sheet as "Retired (Not Involving misconduct)." (Ex. T. -- Walker Global Profile Sheet).

97.     The case of Darrell Walker shows that the CITY is aware of the following, any of which, alone can be found to the moving force behind the injuries suffered by the Plaintiffs in this case:

a.     There is a need to supervise officers in the Lauderhill Police Department regarding sexual violence and other constitutional violations.

b.     Discipline is non-existent at the Lauderhill Police Department because Internal Affairs only exists on paper and is not designed to redress the injuries of citizens at the hands of officers.

c.     The CITY will always avoid disciplining officers as a means of avoiding costly litigation.

d.     The CITY will commit fraud when conveying information to FDLE regarding officer misconduct so that no action can be taken by FDLE against the officer's certificate.

e.      Within the Police Department for DEFENDANT CITY it was policy to take the word of a sworn law enforcement officer over someone who lives in inner city, lacking education, and is poor.

98.    Within the Police Department for DEFENDANT CITY newspaper articles relating to various complaints of sexual misconduct against Darrell Walker, his termination and rehiring and the investigation findings were widespread knowledge, as was the lack of discipline imposed. (Composite Ex. GG. – Sworn Statement of Vogt at p. 7, Smith p. 11, Beans p. 5-10, 13)

99.    Based upon the long, documented, and highly publicized history of sexually related misconduct and other civil rights violations by Officer Walker, it was imperative that the ongoing failures in the hiring, training, employment, supervision and discipline practices of Lauderhill Police Department be addressed and corrected by DEFENDANT CITY, through its officers and agents.

100.    Despite the notice and knowledge of the failures of the Department in its hiring, training, and supervision practices CITY OF LAUDERHILL failed to institute any meaningful changes, thereby allowing for the improper hiring, supervision, discipline and employment of DEFENDANT HARTLEY and DEFENDANT MERENDA.

101.    Walker's employment with the CITY and police department put the CITY OF LAUDERHILL, through its officers and agents on notice of a need to address and correct the ongoing failures in the hiring, training, supervision, and discipline practices of the Lauderhill Police Department.

102.    Post-Walker the CITY needed to change the way it investigated and punished sexually violent officers and/or officers who violated peoples' civil rights.  Internal affairs used

the following reasons to clear Walker in all of his cases: "not sustained" citing "lack of physical, video, or testimonial evidence", "no first hand witness, no corroborating evidence", "no corroborative witness, no physical evidence to prove or disprove allegation, denial of allegation by officer", "**could not locate any unbiased or independent witness(s)** to help substantiate allegations", "none of responding officers could testify that Officer…. Returned to …residence", "could not locate physical evidence to support the allegations", "could not produce any DNA type evidence to support the allegation", "Officer denied all allegations made."  The CITY knew post-Walker, and most reasonable people would intuitively know, that in sexual assault cases the offending officer will always deny the charges and there will often not be independent witnesses as the officers will rarely commit these crimes in public; DNA often will not be available; there normally won't be video evidence as an offender who can pick his time and place to commit the crime won't do it in front of a camera; and when looking for "unbiased" witnesses the CITY should not consider anyone other than a cop to be biased.

103.    If, post-Walker, the CITY had modified the way it investigated complaints of sexual misconduct by an officer this modification of investigation practices would lead to widespread knowledge that investigations of this nature will have meaningful dispositions and that would have stopped DEFENDANT HARTLEY and DEFENDANT MERENDA from attacking the Plaintiffs.

104.    Real investigations with meaningful dispositions paired with meaningful discipline, training, and accurate reporting to FDLE were lacking within DEFENDANT CITY, as such, the CITY was deliberately indifferent to the rights of the Plaintiffs under the Fourth and Fourteenth amendments to the US Constitution.  This was the moving force behind Plaintiffs' injuries.

34

105.    CITY OF LAUDERHILL'S culture of predators was the moving force behind the injury to the Plaintiffs.  DEFENDANT CITY tolerated and rewarded sexually motivated crimes, violations of citizens constitutional rights by its' officers, engaged in an intentional fabrication of documents to cover up crimes by its' officers, refused to supervise and control its' officers, and refused to discipline its' officers knowing that the result would be that its' officers who were predisposed to commit crimes would feel safe to do so because they had seen other officers do it with impunity.

106.    The saga of Walker gave the CITY OF LAUDERHILL countless opportunities to do the right thing, protect the people of Lauderhill and send a message to its' employees that violating peoples' civil rights will not be tolerated.  However, for over 13 years the CITY consistently did the wrong thing, the unconstitutional thing, because doing the unconstitutional thing and being deliberately indifferent to the federally protected rights of their inhabitants is the CITY'S custom, practice and unwritten policy.  This consistent pattern of conduct by the CITY for over a decade sent a clear message to CITY employees that they were not supervised and that if somehow any of their misconduct was detected they would not be disciplined in any meaningful way.

### MORE EXAMPLES OF THE CITY'S CUSTOMS AND PRACTICES THAT LEAD TO THE PLAINTIFFS' INJURIES

#### LT. G. Solowsky

107.    Investigation number IA07-007 was initiated against then Sergeant Gregory Solowsky in October of 2007.  On February 25, 2008 Investigator Sgt. M. Butkus, recommended the following be **"Sustained"** against Solowsky, Chief Kenneth Pachnek concurred:

*Policy 01.110 Code of Conduct, 4.2.1,* "Members will not engage in conduct on or off-duty that adversely affects the morale or efficiency of the Department or engage in conduct on or

off-duty which may destroy public respect for the member and/or the Department and/or destroy confidence in the operation of municipal police services; and

   *Policy 01.110 Code of Conduct, 4.6.1,* "The use of influence of one's official position, or the use of time, facilities, equipment or supplies of the Department for private gain or advantage to oneself or another is prohibited." (Ex. HH --  pg. 13)

   108.   As a result of the sustained violations in IA07-007 the City terminated Solowsky on March 24, 2008. (Ex. II. -- pg 16)

   109.   In furtherance of its custom, pattern and practice of providing inaccurate reasons for termination to FDLE, DEFENDANT CITY, through its officers and agents, reported to FDLE that the reason for Solowsky's 2008 separation from the department was "separation", not "termination." This information is reflected on the Global Profile for Solowsky which provides a snapshot of his career as a law enforcement officer. (Ex. JJ. – Solowsky Global profile)

   110.   On December 29, 2008 on behalf of the CITY OF LAUDERHILL, City Manager, Charles Faranda entered into a "Settlement Agreement" with Solowsky and The Fraternal Order of Police. (Ex. KK. – Solowsky Settlement Agreement)

   111.   In the December 2008 settlement agreement, despite the serious nature of the violations sustained against Solowsky (a department supervisor) and the discipline imposed (termination) CITY OF LAUERHILL'S **City Manager Charles Faranda, stated the CITY'S preference to "enter into a compromise in order to avoid the uncertainties <u>and expense</u> of further litigation."** (Ex. KK. At pg. 3 – Solowsky Settlement Agreement.)

   112.   In furtherance of the CITY's policy and/or custom to save money rather than impose meaningful discipline on officers, the CITY, through Faranda, agreed to: "reinstate the employee (Solowsky) as a Police Sergeant effective December 29, 2008"… "The period between

the Employee's March 24, 2008 termination and December 29, 2008 reinstatement will be treated as follows: March 25, 2008 through April 24, 2008 will be treated as one (1) month disciplinary suspension without…"  "The employee will be given two (2) months back-pay for the period from April 25, 2008 to June 24, 2008…"  "The period from June 25, 2008 through December 28, 2008 will be treated as an administrative leave without pay."  Solowsky was provided with "seniority and accrued vacation and sick leave retroactive to March 24, 2008" and "credited service in the City's Police Officer's Retirement Plan for the period March 24, 2008 through December 28, 2008" and he was allowed to "return to work on January 5, 2009."  (Ex. KK. At pgs. 3-7 – Solowsky Settlement Agreement).

113.     Solowsky was then promoted from Sergeant to Lieutenant.

114.     A policy within DEFENDANT CITY of a failure to discipline, failure to conduct meaningful internal affairs investigations, failure to report accurately to FDLE, and of covering up misconduct is demonstrated by the fact that despite Florida Department of Law Enforcement's list of definitions for use on the Global Profile relating to an officer's reason for separation from a department again, DEFENDANT CITY habitually fails to accurately report separation reasons to FDLE.   Available definitions that were appropriate and available to DEFENDANT CITY at the time of Solowsky's termination and rehiring include:   "AU-Administrative-Unfavorable," "IS- Involuntary Separation," "Mis- Misconduct," "VAP-Terminated for Violating Agency Policy."  Despite the options available and responsibility of the CITY to accurately report to FDLE Solowksy's reason for separation they only used "suspension."  (Ex. LL. – FDLE Global Profile Definitions).

115.     More, existence of a widespread policy within DEFENDANT CITY of a failure to discipline, failure to conduct meaningful internal affairs investigations, of covering up

misconduct, and failing to properly screen for employment as law enforcement officer is evidenced by the fact that CITY was willing to reemploy Solowsky as a Supervisor, despite his prior sustained violations and prior termination by DEFENDANT CITY merely because it was the most cost effective decision to make, not because he was the most fit candidate for the Supervisory position.

116.    The sustained violations in IA07-007 against then Sgt. Solowsky and the initial discipline imposed put the CITY OF LAUDERHILL on notice of a need to address and correct the ongoing failures in the hiring, training, supervision, and discipline practices of the Lauderhill Police Department.

### Sergeant Michael Bigwood

117.    Michael Bigwood is currently a Sergeant at the Lauderhill Police Department working in a supervisory capacity and also as an Internal Affairs Investigator.

118.    On February 4, 2010 internal affairs investigation number IA 10-01 was initiated by a citizen complaint regarding misconduct of Sgt. Bigwood of the Lauderhill Police Department.  (Ex. MM. – Bigwood Internal Affairs Report)

119.    The misconduct of Sgt. Bigwood complained of in IA 10-01 involves his sending a citizen a picture of his penis via text message on his city funded cell phone with the comment "soft shot want to sit on it."  Additionally, the investigation showed that Bigwood had created his own unauthorized task-force where he recruited an attractive young woman to be a confidential informant, paid her and other informants using CITY funds and then directed his subordinate officers to participate in operations using the  female informant knowing that the Lauderhill Police Department had not authorized what he was doing and that his actions clearly violated Florida Statute Section 914.2 known as "Rachel's Law", a law that is designed to protect police

informants. In addition to running his own unauthorized and autonomous task-force Bigwood also emailed a coworker sexually explicit material via the city email system.    (Ex. MM. – Bigwood Internal Affairs Report)

120.    The findings in IA 10-01 concluded that Bigwood did send a photo of his penis to the complainant using his city funded cell phone, he did send sexually explicit emails to a coworker using his work email, he had the complainant working as a confidential informant without proper department registration to ensure her safety, he had the complainant engaged in a covert operation and orchestrated and supervised monitoring by his subordinates within the Crime Suppression Unit, and that more likely than not he gave the complainant lawful direction and she should have been registered as a Confidential Informant with the department but was not. Furthermore, contrary to departmental policy for an undetermined amount of time Bigwood maintained a list and undetermined number of Confidential Informants in his desk- instead of turning the files over to the Sergeants of the Vice, Intelligence, and Narcotics Unit who maintain a registry of all departmental confidential informants and keep the files secured and controlled.

121.    The CITY, through its officers and agents, failed to supervise Bigwood's activities regarding his use of unregistered Confidential Informants and his unfettered use of CITY funds to pay what he determined to be Confidential Informant related expenditures.

122.    On May 17, 2010 Lauderhill Police Department Office of Internal Affairs Sergeant Christopher Carroll issued a recommendation in IA 10-01, which was read and concurred with by Lauderhill Police Department Chief Kenneth Pachnek, sustaining Sgt. Bigwood's violation of 4 of 5 departmental policies including:

*Policy 42.105 Confidential Informants Section E7C* "All records that reveal the confidential informants identity and undercover personnel identities shall be filed with the VIN (Vice, Intelligence, and Narcotics Unit), and maintained in a strictly confidential manner"; and

*Policy 42.105 Confidential Informants Section E7F* "Upon the file's completion, it shall be placed and maintained in a secure place with restricted and controlled access limited to the VIN supervisor"; and

*Policy 01.110 Code of Conduct Section D2A* "Members will not engage in conduct that adversely affects the morale or efficiency of the department or engage in conduct on or off duty which may destroy public respect for the member and/or department and/or destroy confidence in the operation of municipal police services"; and

*City of Lauderhill Policy MIS 8.2 Email and Internet Use Section (A)* " The use of the electronic mail system is to be used for work related business.  No communication may be transmitted via the electronic mail system using any offensive or disruptive language.  Messages are considered per se offensive if they contain sexual implications."

123.    The moving force behind Bigwood's conduct was the lack of supervision, discipline, and training within the Police Department for DEFENDANT CITY OF LAUDERHILL.  Sergeant Bigwood felt he could run his own Confidential Informant task force, paying informants with city money, and have sexual relationships with his informants without risk of supervisors noticing or caring.

124.    Regarding the investigation IA 10-01 into Sgt. Bigwood's conduct, FDLE CJSTC Form 78, "Internal Investigation Report" was completed on June 8, 2010 and signed off on by Chief of Police for DEFENDANT CITY, Kenneth Pachnek.  Section 11 of CJSTC Form 78 lists the outcome of Bigwood's violation of agency policy 42.105 Sections (E1F) and (E7C), Policy 01.100 Code of Conduct Section (D2A), and MIS-8.2 Email and Internet Use Section (A) as "Sustained".  Section 14 of Form 78 lists the agency disciplinary action as "Termination."  This

document was received by FDLE's Criminal Justice Professionalism Program on June 15, 2010.
(Ex. NN. – Bigwood CJSTC Form 78)

125.    On July 14, 2010 Charles Faranda, City Manager for the DEFENDANT CITY OF LAUDERHILL, issued a Termination Notification letter to Michael Bigwood acknowledging the city was on notice of the seriousness of the various violations he committed.  Chief Packnek and Human Resources Representative, Revlon Fennell were copied on this letter. (Ex. OO. – 7-14-2010 Letter to Bigwood from CITY Manager)

126.    Specifically, Faranda acknowledges that it is "important to note that the phone you used to send the offensive text message was fully paid for by the city," and it is "entirely inappropriate for you to use the Department as a dating service or your badge as a means of seducing members of the community or locating potential dates or love interests."  (Ex. OO. at Pg. 3)

127.    Further in Faranda's July 14, 2010 correspondence to Bigwood he states the following:  "As a police officer in a supervisory capacity, your actions are a direct reflection on the Department.  Both the City and the Department strive to ensure that those persons employed by the City as law enforcement officers exhibit the highest level of professionalism so that members of the community can trust the Department, to be confident in the protective services they receive, and can rest assured that officers will not prey on them or abuse their power but will, instead, enforce the law and safeguard the life and property of members of the community." (Ex. OO. at pg.4)

128.    The July 2010 letter from DEFENDANT CITY OF LAUDERHILL's City Manager Faranda, Cc'ing Chief Pachnek and Revlon Fennell, shows that the city is on notice of

the need to take appropriate measures within the CITY to safeguard the community from officers that use their positions to prey on citizens and monitor activities of its' officers.

129.    Despite the disciplinary action of "Termination" imposed upon Sgt. Michael Bigwood, Defendant CITY OF LAUDERHILL, through its officers and agents, reinstated him on October 3, 2011 per a September 2011 arbitration order where the arbitrator found that none of the offenses - ***although they were all committed***, either individually or collectively, were so egregious that summary termination was warranted, noting that "termination is a death sentence to the career a police officer."

130.    After Bigwood was reinstated the CITY made no changes to is polices or procedures relating to its' supervision of officers to ensure no officer would ever feel so unsupervised that they would feel comfortable enough to brazenly, and with the assistance of officers around them, violate the rights of the people of Lauderhill.  Post-Bigwood the CITY was aware that even high-ranking officers realized that supervision was so lacking that they could use department money and personnel to set up an unauthorized and illegal task-force that was designed to enable them to more easily have sex with citizens.

131.    Even after the CITY and police department found that Bigwood had committed serious violations they left him in a supervisory position.

132.    In September of 2012 the Chief of Police for the Pembroke Pines Police Department contacted Chief Andrew Smalling of Lauderhill Police Department in order to obtain "a qualified individual with strong operational and administrative skills who has served at the rank of Sergeant, Lieutenant or Captain with at least three years of supervisory experience to serve on the assessor panel."  Chief Small recommended Mike Bigwood for this position despite

the knowledge of the CITY, through its officers and agents, that Bigwood had committed criminal acts as a supervisor.   (Ex. PP. – 9-17-2012 Letter)

133.    The 2010 text messages of a sexual nature sent by Sgt. Bigwood to a female citizen and his misuse of Confidential Informants put the CITY OF LAUDERHILL, through its officers and agents, on notice of a need to address and correct the ongoing failures in the hiring, training, supervision, and discipline practices of the Lauderhill Police Department.

134.    The failure by DEFENDANT CITY, through its officers and agents, to take appropriate measures within the department and the sexual nature of the interactions between Sgt. Bigwood and a female citizen show a direct relation to the sexual misconduct of DEFENDANTS HARTLEY and MERENDA, thereby making the incident involving the Plaintiffs here foreseeable.  The DEFENDANT CITY'S failure was the moving force behind the conduct of DEFENDANTS HARTLEY AND MERENDA.

135.    The failures by the DEFENDANT CITY, through its' officers and agents demonstrates the deliberate indifference of the municipality to the rights of the Plaintiffs' under the Fourth and Fourteenth Amendments to the US Constitution.

### <u>Officer Anthony Micelli</u>

136.    From 2006 through 2009 the following complaints were initiated against Micelli: IA 10132006 use of force, COM 12-08 code of conduct, 08-009 use of force, COM 03-07 knowledge of laws, COM 08-07 property/evidence, and IA 07-003 false arrest.  Each of the six investigations were closed as either exonerated or not sustained.

137.     In 2010 Anthony Micelli applied to other law enforcement agencies for employment while still employed by DEFENDANT CITY OF LAUDERHILL.  During the course of the background investigations with one of the other departments Micelli admitted to

various violations which the prospective employer reported to his current employer, DEFENDANT CITY.  Once the other agencies notified DEFENDANT CITY IA-10-03 was initiated against Micelli.  When questioned by Lauderhill internal affairs  Micelli admitted that he had committed the following crimes when he was a CITY OF LAUDERHILL employee: "keeping money from someone two times", he and a fellow officer "took boot-leg DVDs home that they took from the arrestee," "if someone pushes off him he writes it as though the person punched him,"  admits to "deliberately falsifying information in a police report or affidavit," admits to administering "extra blows" when using force, "when someone's talking to you, you slam them against the car.  I've done stuff like that,"  and he admits to "throwing out drugs." (Ex. QQ. – Micelli IA Summary)

138.    When internal affairs completed its investigation in case number 10-03 regarding Micelli the CITY and/or the department never went back to redress the injuries to complainants caused by Micelli in the internal affairs cases from 2006 through 2009.  The police department and the CITY had discovered new evidence from Micelli's own sworn testimony that he had actually committed the violations that the department investigated in:     IA-10132006 use of force, COM 12-08 code of conduct, 08-009 use of force, COM 03-07 knowledge of laws, COM 08-07 property/evidence, and IA 07-003 false arrest. Each of the six investigations were closed as either exonerated or not sustained.  Once the DEFENDANT CITY learned of Micelli's admissions it never went back to the citizens underlying the six complaints to right the wrongs of Micelli and compensate them for any loss that they may have suffered.

139.    The criminal acts of Micelli and the above officers demonstrates a lack of supervision within the department, the lack of follow-up on investigations demonstrates the lack

of meaningfulness of said investigations and as such make the injuries suffered by Plaintiffs at the hands of DEFENDANTS HARTLEY and MERENDA foreseeable.

## HARTLEY BACKGROUND AND OTHER CIVIL RIGHTS LAWSUITS AGAINST HARTLEY AND MERENDA

140.   DEFENDANT FRANKLIN HARTLEY applied to City of Lauderhill Police Department for position of law enforcement officer on October 24, 2006. (Ex. RR. – HARTLEY Application).

141.   DEFENDANT FRANKLIN HARTLEY had previously, without success applied to two other law enforcement agencies for a position as a law enforcement officer. (Ex. -- RR. at pg. 7)

142.   Although DEFENDANT FRANKLIN HARTLEY acknowledged in his application to DEFENDANT CITY that he had previously applied to two other law enforcement agencies, and had not been hired, these agencies were not contacted for information and records relating to HARTLEY'S rejections.   (Ex. SS. – Lauderhill Employment Background Investigation at pg. 2).

143.   The de facto policy of failing to properly screen and investigate potential applicants caused Det. C. W. Banks of Lauderhill Police Department to fail to contact other local police agencies who had declined to hire DEFENDANT FRANKLIN HARTLEY.   An appropriate background investigation would have proven DEFENDANT HARTLEY was not fit to be a law enforcement officer.

144.   Despite the fact that CITY OF LAUDERHILL never looked into why two other agencies declined to hire DEFENDANT HARTLEY as a law enforcement officer he was cleared for hire on April 10, 2007 by Former Chief of Police Kenneth Pachnek, Sgt. Michael Butkus of

the Professional Standards Unit, and Detective Chris W. Banks, Background Investigator.  (Ex. SS. – Lauderhill Employment Background Investigation at pg. 5)

145.    Thereafter, in late 2011 and early 2012 the CITY OF LAUDERHILL received various complaints against DEFENDANT HARTLEY relating to his misconduct ranging from unprofessional conduct, inadequate investigation, and false reporting.  As early as December 2011 the CITY was put on notice of HARTLEY'S illegal behavior and that he needed further training/supervision/discipline. (Ex. TT. – HARTLEY IA files)

146.    DEFENDANT CITY OF LAUDERHILL received a notice intent to sue for civil rights violations from Richard Ross in March of 2012 relating to the unconstitutional conduct of DEFENDANT HARTLEY, DEFENDANT MERENDA, Chief Smalling and the CITY OF LAUDERHILL.  By this time the CITY was provided further notice that HARTLEY and MERENDA exhibited dangerous behavior patterns and needed further training/supervision/discipline.

147.    Richard Ross filed a Federal civil rights lawsuit against DEFENDANTS CITY OF LAUDERHILL, HARTLEY, MERENDA and another officer, along with Chief Smalling, for various Fourth and Fourteenth Amendment violations in Federal Court on April 9, 2012 under case number 0:12-cv-60623-WPD.  Ross alleges in paragraph 45 of his Complaint that MERENDA and HARTLEY illegally detained him and HARTLEY threatened him by stating that, "We're going to fuck you up, Jew boy. You fucking kike." (Ex. UU. – Ross Complaint filed 04-09-2012)

148.    On November 4, 2013 in case 0:12-cv-60623-WPD, Plaintiff Ross and the Defendant officers, including HARTLEY and MERENDA, negotiated a settlement whereby Ross was paid $75,000.  HARTLEY and MERENDA were never disciplined.

149.    At the November 25, 2013 Lauderhill City Commission Meeting City Manager, Charles Faranda, requested approval of resolution no. 13R-11-234 to approve the "settlement agreement between The City of Lauderhill and Richard M. Ross in exchange for a general release; providing for an effective date".

150.    A motion to Approve the Consent Agenda, which included Resolution No. 13R-11-234, was made by Commissioner Hawyard J. Benson, Jr. and seconded by Vice Mayor Ken Thurston.    "Yes" votes were provided by:    Commissioner Benson, Vice Mayor Thurston, Commissioner M. Margaret Bates, and Commissioner Howard Berger. No inquiries regarding the resolution are noted in Commission minutes.

151.    The complaints and incidents related to 0:12-cv-60623-WPD/Resolution No. 13R-11-234 put Defendant CITY OF LAUDERHILL on notice that the illegal behavior of HARTLEY and MERENDA posed a foreseeable risk to those members of the community they came in contact with.   However, CITY failed to institute any meaningful disciplinary actions or retraining.

152.    DEFENDANT HARTLEY AND MERENDA knew the CITY OF LAUDERHILL, through its officers and agents, was consistently failing to supervise, discipline, train, and conduct meaningful internal affairs investigations.  This knowledge caused HARTLEY AND MERENDA to know that their whereabouts when on duty were not being monitored and that they were free to commit illegal and unconstitutional acts with impunity.   The CITY'S failures were the moving force behind HARTLEY and MERENDA'S violent crimes committed against Plaintiffs.

153.    The CITY'S pattern of making findings in internal affairs investigations in manners that blatantly contradict the DEFENDANT CITY's own written policy, as well as,

FDLE's definitions for what "Sustained" and "Unfounded" findings mean demonstrates a pattern and practice of covering up misconduct, failing to discipline and supervise/train on behalf of DEFENDANT CITY OF LAUDERHILL and results in a lack of meaningful internal affairs investigations.

154.    A lack of meaningful internal affairs investigations into complaints of sexual misconduct by employees of DEFENDANT CITY is directly related to the misconduct of DEFENDANTS HARTLEY AND MERENDA, thereby making the incident involving the Plaintiffs foreseeable and the CITY's pattern of conduct the moving force behind the conduct of HARTLEY AND MERENDA.

155.    Defendant CITY OF LAUDERHILL, through its officers and agents, intentionally failed to institute a meaningful investigation/disciplinary system which held officers accountable for their misconduct.  This lack of meaningful discipline and investigation was the proximate cause of the deprivation of rights suffered by the Plaintiffs and made the injuries suffered by the Plaintiffs foreseeable.

156.    Defendant CITY OF LAUDERHILL, through its officers and agents, has a duty to train, supervise, control, or otherwise ensure that all its officers, including Defendants HARTLEY and MERENDA, did not violate the constitutional rights of persons such as the Plaintiffs.  The CITY breached this duty and caused the injury to the Plaintiffs.

157.    The above acts and omissions of each Defendant constitutes a course of conduct and failure to act which amounts to a deliberate indifference to the rights, health, safety and welfare of the Plaintiffs and those similarly situated, resulting in the violation of their rights under State and Federal law.

158.     As a direct and proximate result of the acts of Defendants THOMAS MERENDA, FRANKLIN HARTLEY, and the CITY OF LAUDERHILL, the Plaintiffs, JANE DOE 1 and JANE DOE 2 suffered the following injuries and damages:

a.     Violations of Plaintiffs constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution;

b.     Severe permanent physical, mental, and emotional injuries.

c.     Loss of enjoyment of life.

## COUNT I.
## 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT HARTLEY

159.     The Plaintiffs reallege paragraphs 15 through 53.

160.     While Defendant HARTLEY was acting under the color of state and federal law as a police officer for the CITY OF LAUDERHILL, he subjected the Plaintiffs to the deprivation of rights and privileges secured to them under the Fourth and Fourteenth Amendments to the United States Constitution.

161.     The actions and conduct of Defendant HARTLEY violated the rights of the Plaintiffs under the United States Constitution.  Defendant HARTLEY intentionally violated the bodily integrity of both Plaintiffs.  Defendant HARTLEY caused the Plaintiffs to be illegally detained and imprisoned and used excessive force during such detention and violated their constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

162.     As a direct and proximate cause of the acts described above the Plaintiffs have suffered severe physical, mental and emotional injuries, and loss of enjoyment of life.

163.     A remedy for the violation of these rights is provided by 42 U.S.C §1983.

**WHEREFORE,** Plaintiffs JANE DOE 1 and JANE DOE 2, demand compensatory and punitive damages against Defendant HARTLEY, costs, attorney's fees and trial by jury for all issues so triable by right.

### COUNT II.
### 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT MERENDA

164.    The Plaintiffs reallege paragraphs 15 through 53.

165.    While Defendant MERENDA was acting under the color of state and federal law as a police officer for the CITY OF LAUDERHILL, he subjected the Plaintiffs to the deprivation of rights and privileges secured to them under the Fourth and Fourteenth Amendments to the United States Constitution.

166.        The actions and conduct of Defendant MERENDA violated the rights of the Plaintiffs under the United States Constitution.  Defendant MERENDA  intentionally violated the bodily integrity of both Plaintiffs.  Defendant MERENDA caused the Plaintiffs to be illegally detained and imprisoned and used excessive force during such detention and violated their constitutional rights under the Fourth, and Fourteenth Amendments to the United States Constitution.

167.    As a direct and proximate cause of the acts described above the Plaintiffs have suffered severe physical, mental and emotional injuries, and loss of enjoyment of life.

168.    A remedy for the violation of these rights is provided by 42 U.S.C §1983.


**WHEREFORE,** Plaintiffs JANE DOE 1 and JANE DOE 2, demand compensatory and punitive damages against Defendant MERENDA, costs, attorney's fees and trial by jury for all issues so triable by right.

50

<u>COUNT III.</u>
<u>42 U.S.C. §1983 CLAIM AGAINST DEFENDANT CITY OF LAUDERHILL</u>

169.     The Plaintiff reallege paragraphs 14 through 158.

170.     At all times material hereto, Defendant CITY OF LAUDERHILL, through its officers and agents, was responsible for adopting and implementing the rules and regulations in regard to hiring, the act of hiring, screening, training, supervising, disciplining, and controlling and assigning police officers and/or employees to their duties within the City of Lauderhill Police Department.

171.     At all times material hereto, Defendant CITY OF LAUDERHILL, through its officers and agents, was deliberately indifferent in that the department either expressly or impliedly acknowledged and assented to the failure to supervise, discipline, control, train and/or otherwise screen employees of the Lauderhill Police Department including, but not limited to, Defendants HARTLEY and MERENDA for dangerous propensities, lack of training and/or skill or other characteristics making said officers unfit to perform their duties.

172.     Defendant CITY, through its officers and agents, knew or should have known of the history of widespread abuses existing with respect to the supervision, hiring, training, discipline, and control of officers/employees within the Lauderhill Police Department.

173.     At all times material hereto, Defendant CITY OF LAUDERHILL, through its officers and agents, was deliberately indifferent to the rights and safety of the public, including the Plaintiffs, in that despite notice it failed to remedy the history of widespread abuses existing with respect to the hiring, training, supervision, discipline, and control of officers/employees within the Lauderhill Police Department.

174.     At all times material hereto, Defendant CITY OF LAUDERHILL, through its officers and agents, was deliberately indifferent to the rights and safety of the public, including

51

the Plaintiffs, in that it failed to determine whether members of the City of Lauderhill Police Department, including Defendants HARTLEY and MERENDA, posed a threat to the public as a result of their propensity to commit unlawful acts.

175.    DEFENDANT CITY OF LAUDERHILL'S deliberate indifference to the problems within its police department caused a substantial risk of harm to the Plaintiffs and other members of the public.

176.    At all times material hereto, Defendant CITY OF LAUDERHILL, through its deliberate indifference, failed to ensure that the police officers of the City of Lauderhill did not violate the constitutional and statutory rights of citizens of the State of Florida, including the Plaintiffs, while said officers were acting under the color of law for the City of Lauderhill Police Department.

177.    Defendant CITY OF LAUDERHILL has maintained a system of inadequate review of incidents of abuse of lawful authority such as illegal and unlawful detentions and/or arrests and/or prosecutions, among other things, by officers, and complaints thereof, which has failed to identify illegal seizures or excessive force by officers, and has failed to subject officers who employed illegal or improper acts to appropriate discipline, and/or supervision and/or retraining, and failure to accurately report separation reasons to FDLE, to the extent that it has become the de facto policy and custom of the City of Lauderhill Police Department to tolerate such acts by its officers.

178.    Defendant CITY OF LAUDERHILL, through its officers or agents, has maintained a long-standing, widespread history of failure to properly hire and/or train and/or supervise and/or discipline its officers for, among other things, unlawful detentions and/or arrests and/or prosecutions, even though they had notice of such unlawful conduct by employees.

52

179.     The foregoing acts, omissions, policies or customs of Defendant CITY OF LAUDERHILL caused officers, including Defendants HARTLEY and MERENDA, to believe that acts such as unlawful seizures and/or detentions, and/or arrests and/or prosecutions, among other things, would not be discovered because there was no supervision but even if they were discovered they would not result in a meaningful investigation or discipline, with the foreseeable result that officers, including  Defendants HARTLEY and MERENDA, were more likely to make unlawful seizures and/or detentions and/or arrests and/or prosecutions and/or commit criminal acts.

180.     The Plaintiffs have both been the victims of abuses of the lawful authority of DEFENDANTS HARTLEY AND MERENDA, and said illegal acts were the foreseeable result of the previously described acts, omissions, and policies or customs of DEFENDANT CITY, through its officers and agents.

181.     As a direct and proximate cause of the acts described above, the Plaintiffs have suffered severe physical, mental and emotional injuries, and loss of enjoyment of life as heretofore alleged.

182.     42 U.S.C. §1983 provides a remedy for violation of these rights.

**WHEREFORE,** Plaintiffs JANE DOE 1 and JANE DOE 2, demand compensatory damages against DEFENDANT CITY OF LAUDERHILL, costs, attorney's fees and trial by jury for all issues so triable by right.


**COUNT IV.**
**STATE TORT CLAIM AGAINST DEFENDANT HARTLEY**
**FOR ASSAULT & BATTERY**

183.     The Plaintiffs reallege paragraphs 15 through 53.

53

184.    In committing the assault and battery on the Plaintiffs, Defendant HARTLEY acted brutally, willfully, maliciously, and without any excuse or justification.  DEFENDANT HARTLEY, callously and recklessly, by his actions disregarded the safety of the Plaintiffs.

185.    The assault and battery on the Plaintiff was due to the negligent hiring, retention, insufficient training, supervision and/or discipline of DEFENDANT CITY OF LAUDERHILL, through its officers and agents, and the intentional, willful and malicious conduct of Defendant HARTLEY.

186.    As a direct result of the above-described wrongful acts of Defendant HARTLEY, and the injuries cause thereby, as alleged above, the Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations or emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, were prevented and will continue to be prevented from performing their daily activities and obtaining full enjoyment of life, and have incurred and will continue to incur expenses for medical, emotional, and mental health treatment.

**WHEREFORE,** Plaintiffs JANE DOE 1 and JANE DOE 2, demand compensatory and punitive damages against Defendant HARTLEY, costs, and trial by jury for all issues so triable by right.

### COUNT V.
### STATE TORT CLAIM AGAINST DEFENDANT HARTLEY
### FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

187.    The Plaintiffs reallege paragraphs 15 through 53.

188.    Defendant HARTLEY'S conduct was extreme and outrageous and was intentional and/or done recklessly.

189.    The above mentioned acts were beyond the bounds of human decency, let alone the confines of the law, and were virtually certain to and did result in emotional distress to the Plaintiffs.

190.    As a result of Defendant HARTLEY'S conduct Plaintiffs experienced and continue to experience severe emotional distress resulting in bodily harm.

191.    As a direct result of the above-described wrongful acts of Defendant HARTLEY, and the injuries cause thereby, as alleged above, the Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations or emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, were prevented and will continue to be prevented from performing their daily activities and obtaining full enjoyment of life, and have incurred and will continue to incur expenses for medical, emotional, and mental health treatment.

(A)    At all times relevant hereto, Defendant HARTLEY was acting outside the scope of his authority and in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, rendering him individually liable.

(B)    Plaintiffs have provided proper notice under F.S. 768.28 and have satisfied all conditions precedent.

**WHEREFORE,** Plaintiffs JANE DOE 1 and JANE DOE 2, demand compensatory and punitive damages against Defendant HARTLEY, costs, and trial by jury for all issues so triable by right.

### COUNT VI.
### STATE TORT CLAIM AGAINST DEFENDANT MERENDA
### FOR ASSAULT & BATTERY

192.    The Plaintiffs reallege paragraphs 15 through 53.

193.    In committing the assault and battery on the Plaintiffs, Defendant MERENDA acted brutally, willfully, maliciously, and without any excuse or justification.  The Defendant, callously and recklessly, by his actions disregarded the safety of the Plaintiffs.

194.    The assault and battery on the Plaintiff was due to the negligent hiring, retention, insufficient training, supervision and/or discipline of DEFENDANT CITY OF LAUDERHILL, through its officers and agents, and the intentional, willful and malicious conduct of Defendant MERENDA.

195.    As a direct result of the above-described wrongful acts of Defendant MERENDA, and the injuries cause thereby, as alleged above, the Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations or emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, were prevented and will continue to be prevented from performing their daily activities and obtaining full enjoyment of life, and have incurred and will continue to incur expenses for medical, emotional, and mental health treatment.

**WHEREFORE,** Plaintiffs JANE DOE 1 and JANE DOE 2, demand compensatory and punitive damages against Defendant MERENDA, costs, and trial by jury for all issues so triable by right.

<u>COUNT VII.</u>
<u>STATE TORT CLAIM AGAINST DEFENDANT MERENDA</u>
<u>FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

196.    The Plaintiffs reallege paragraphs 15 through 53.

197.    Defendant MERENDA'S conduct was extreme and outrageous and was intentional and/or done recklessly.

56

198.    The above mentioned acts were beyond the bounds of human decency, let alone the confines of the law, and were virtually certain to and did result in emotional distress to the Plaintiffs.

199.    As a result of Defendant MERENDA'S conduct Plaintiffs experienced and continue to experience severe emotional distress resulting in bodily harm.

200.    As a direct result of the above-described wrongful acts of Defendant MERENDA, and the injuries cause thereby, as alleged above, the Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations or emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, were prevented and will continue to be prevented from performing their daily activities and obtaining full enjoyment of life, and have incurred and will continue to incur expenses for medical, emotional, and mental health treatment.

(A)    At all times relevant hereto, Defendant MERENDA was acting outside the scope of his authority and in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, rendering him individually liable.

(B)    Plaintiffs have provided proper notice under F.S. 768.28 and have satisfied all conditions precedent.

**WHEREFORE,** Plaintiffs JANE DOE 1 and JANE DOE 2, demand compensatory and punitive damages against Defendant MERENDA, costs, and trial by jury for all issues so triable by right.

### COUNT VIII.
### STATE TORT CLAIM AGAINST CITY OF LAUDERHILL
### FOR NEGLIGENT
### INFLICTION OF EMOTIONAL DISTRESS

201.    The Plaintiffs reallege paragraphs 14 through 158.

57

202.    Defendants HARTLEY and MERENDA assaulted and committed sexual battery upon the Plaintiffs and was enabled to do so only as a result of their employment with Defendant CITY OF LAUDERHILL as police officers.

203.    Defendant CITY OF LAUDERHILL, through its officers and agents, had a common law duty to protect others from the result of their negligent hiring, supervision and/or retention of Defendants HARTLEY and MERENDA and the foreseeable zone of risk to Plaintiffs and others created by their status as police officers.

204.    Defendant CITY OF LAUDERHILL knew or should have known that their failure to exercise due care in hiring, supervision, and/or retention of Defendants HARTLEY and MERENDA would cause severe emotional distress, as well as physical harm, to third persons including the Plaintiffs here.

205.    At all times relevant hereto, Defendants HARTLEY and MERENDA were acting within the scope of their authority and acting as agents of DEFENDANT CITY OF LAUDERHILL, pursuant to §768.28 and §30.07, Florida Statutes, rendering Defendant CITY liable.

206.    As a result of the Defendant CITY OF LAUDERHILL's negligence, Plaintiffs experienced and continue to experience severe emotional distress.

207.    As a result of the above-described conduct, the Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations or emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, were prevented and will continue to be prevented from performing their daily activities and obtaining full enjoyment of life, and have incurred and will continue to incur expenses for medical, emotional, and mental health treatment.

**WHEREFORE,** Plaintiffs JANE DOE 1 and JANE DOE 2, demand compensatory damages against DEFENDANT CITY OF LAUDERHILL, costs, and trial by jury for all issues so triable by right.

## COUNT VIV.
## VICARIOUS LIABILITY FOR NEGLIGENCE
## DEFENDANT CITY OF LAUDERHILL

208.    The Plaintiffs reallege paragraphs 14 through 158.

209.    At all times hereto, the Defendant CITY OF LAUDERHILL acted by and through its agents, employees, and/or officers.

210.    At all times material hereto, individuals employed by the CITY OF LAUDERHILL acted within the course and scope of employment with said Defendant.

211.    As a direct and proximate result of the negligence of the agents, employees and/or officers of the Defendant CITY OF LAUDERHILL, the Plaintiffs sustained injuries, for which said Defendant is vicariously liable as a matter of law.

**WHEREFORE,** Plaintiffs JANE DOE 1 and JANE DOE 2, demand compensatory damages against Defendant CITY OF LAUDERHILL, costs, and trial by jury for all issues so triable by right.


Dated:          June 25th 2014                    Respectfully submitted,
                Fort Lauderdale, Florida

                                                  ATTORNEYS FOR PLAINTIFFS

                                                  Greg Lauer, Esq.
                                                  Lauer & Currie, P.A.
                                                  644 Se 5 Avenue
                                                  Fort Lauderdale, Fl 33301
                                                  Phone:(954) 533-4498
                                                  Facsimile:   (954) 533-4501

                                                  By:     S/Greg M. Lauer
                                                  Greg M. Lauer

59

Fla. Bar No. 652709
*greg@law-lc.com*

Christina Currie, Esq.
Lauer & Currie, P.A.
644 Se 5 Avenue
Fort Lauderdale, Fl 33301
Phone:(954) 533-4498
Facsimile:    (954) 533-4501

By:  S/<u>Christina M. Currie</u>
     Christina M. Currie
     Fla. Bar No. 90987
     *cmc@law-lc.com*

Bradford Cohen, Esq.
Bradford Cohen Law
1132 Se 3 Avenue
Fort Lauderdale, Fl 33316-1110
Phone: (954) 523-7774
Facsimile:(954) 523-2656

By: S/<u>Bradford Cohen</u>
     Bradford Cohen
     Fla. Bar No. 118176
     *service.bclaw@gmail.com*